1  Ben. F. Pierce Gore (SBN 128515)
   PRATT & ASSOCIATES
2  1871 The Alameda, Suite 425
   San Jose, CA 95126
3  (408) 429-6506
   pgore@prattattorneys.com

4
   Charles Barrett
5  CHARLES BARRETT, P.C.
   6518 Highway 100
6  Suite 210
   Nashville, TN 37205
7  (615) 515-3393
   charles@cfbfirm.com

8
   *Attorneys for Plaintiff*

9

10                UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                     SAN JOSE DIVISION

13

14  CHAD BRAZIL, individually and on behalf of      Case No. CV12-01831 (LHK)
    all others similarly situated,
15                                                  **PLAINTIFF'S MEMORANDUM IN
                    Plaintiff,                       OPPOSITION TO DEFENDANT'S
16                                                   MOTION TO DECERTIFY**
    v.
17                                                  Date:    October 16, 2014
    DOLE PACKAGED FOODS, LLC,                       Time:    1:30 p.m.
18                                                  Judge:   Hon. Lucy H. Koh
                    Defendant.
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF THE ISSUES TO BE DECIDED ..................................................... iv

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

BACKGROUND ................................................................................................................ 1

    A.    The Court's Class Certification Order ................................................ 1

    B.    Dr. Capps Calculated The Impact Of Dole's Sales From Its "All Natural Fruit" Label Claim Using A Hedonic Regression Model ............................. 2

        1.    The Methodology Is "Hedonic Regression" ...................... 2

        2.    The Mechanics of Dr. Capps' Analysis .............................. 3

    C.    What Dole Seeks In Its Motion ............................................................ 5

LEGAL STANDARDS FOR DECERTIFICATION, *DAUBERT* AND DAMAGES .................... 5

ARGUMENT ....................................................................................................................... 6

    A.    Dr. Scott Is Not Qualified To Offer Her Opinions ......................... 6

    B.    Dr. Scott's Six "Flaws" Have No Merit ............................................ 7

        1.    There Is No Flaw #1: Dr. Capps' Regression Model Showed The Impact On Dole Sales ...................................... 7

        2.    There Is No Flaw #2: "Brand" And "Label" Are Not Confounded. ............ 10

        3.    There Is No Flaw #3: Benefits To Dole Can Be Measured Using Retail Level Data ............................................ 12

        4.    There Is No Flaw #4: Dr. Capps Controls For All Variables ........................ 13

        5.    There Is No Flaw #5: The Only Embarrassment Is Dole's Misleading Statements ........................................ 15

        6.    There Is No Flaw #6: Use Of The *Anstine* "All Natural" Study Satisfies *Comcast* ........................................ 17

    C.    The Damages Class Should Remain Certified Because Under California Law The Court Should Award Nominal Damages ......... 18

    D.    There Is No Ascertainability Problem For Either Class .................. 18

CONCLUSION ................................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Bazemore v. Friday*,
    478 U.S. 385 (1986).................................................................................................. 6

*Bruton v. Gerber Prods. Co.*,
    2014 U.S. Dist. LEXIS 86581 (N.D. Cal. June 23, 2014) ........................................ 1, 18

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ...........................................................................................1, 2

*Cummings v. Connell*,
    402 F.3d 936, 2005 U.S. App. LEXIS 4954 (9th Cir. 2005) ....................................... 18

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993).................................................................................................. 6

*Haiping Su v. NASA*,
    2011 U.S. Dist. LEXIS 153566 (N.D. Cal. Apr. 7, 2011) ........................................... 16

*Hartle v. FirstEnergy Generation Corp.*,
    2014 U.S. Dist. LEXIS 43033 (W.D. Pa. Mar. 31, 2014) ........................................... 6

*Ill. Tool Works, Inc. v. MOC Prods. Co.*,
    2014 U.S. Dist. LEXIS 76360 (S.D. Cal. June 2, 2014)............................................. 16

*In re Cathode Ray Tube Antitrust Litig.*,
    2013 U.S. Dist. LEXIS 137944 (N.D. Cal. June 20, 2013) ......................................... 6

*In re High-Tech Emple. Antitrust Litig.*,
    2014 U.S. Dist. LEXIS 47181 (N.D. Cal. April 4, 2014) .........................................5, 6

*In re Toyota Motor Corp. Hybrid Brake Mktg.*,
    2012 U.S. Dist. LEXIS 151559 (C.D. Cal. Sept. 20, 2012) ....................................... 6

*ProMex, LLC v. Hernandez*,
    781 F. Supp. 2d 1013 (C.D. Cal. 2011) ................................................................... 18

*Red v. Kraft Foods, Inc.*,
    2012 U.S. Dist. LEXIS 186948 (C.D. Cal. Apr. 12, 2012) ......................................... 13

*Rosales v. El Rancho Farms*,
    2014 U.S. Dist. LEXIS 11134 (E.D. Cal. Jan. 28, 2014) .............................................. 5

*Scofield v. Critical Air Medicine, Inc.*,
    45 Cal. App. 4th 990, 52 Cal. Rptr. 2d 915, 1996 Cal. App. LEXIS 474 (Cal. App. 2d
    Dist. 1996)............................................................................................................ 18

*Staples v. Hoefke*,
    189 Cal. App. 3d 1397, 235 Cal. Rptr. 165 (1987)................................................... 18

*United States v. Chischilly*,
    30 F.3d 1144 (9th Cir. 1994)..................................................................................... 6

*Vaccarino v. Midland Nat'l Life Ins. Co.*,
    2014 U.S. Dist. LEXIS 18601  (C.D. Cal. Feb. 3, 2014) ................................................................ 6

*Weiner v. Snapple Bev. Corp.*,
    2010 U.S. Dist. LEXIS 79647, 2010 WL 3119452 (S.D.N.Y. Aug. 3, 2010) ........................... 13

**Statutes**

Cal. Civ. Code § 3360 ............................................................................................................................ 18

**Other Authorities**

Agricultural and Resource Economics Review,
    *Documenting Food Safety Claims and Their Influence on Product Prices*,
    Ji Li and Neal H. Hooker 38/3 (December 2009) ........................................................................ 3

Department of Agricultural Economics, McGill University, Montreal,
    *A Hedonic Analysis of Retail Milk and Oatmeal Attributes in Quebec*,
    Xiao, J. (2012) ...................................................................................................................................... 3

Economica,
    *Consumption Theory in Terms of Revealed Preference*,
    Paul A. Samuelson: 243-253 (1948) ............................................................................................... 10

International Food and Agribusiness Management Review,
    *Hedonic Analysis of Sustainable Food Products*,
    Thasanee Satimanon and Dave D. Weatherspoon, Volume 13, Issue 4 (2010) ...................... 3

Journal of Farm Economics,
    *Quality Factors Influencing Vegetables Prices*, 10, 185-196, F.V. Waugh (1928) .................. 8

Journal of Food Products Marketing,
    *The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals*,
    Muth, M. K., C. Zhen, J. Taylor, S. Cates, K. Kosa, D. Zorn, and C. Choiniere
    19:279-298 (2013) ................................................................................................................................ 3

London School of Economics,
    *Form Linear Regression Models with Logarithmic Transformations*,
    Kenneth Benoit, March 17, 2011 ...................................................................................................... 11

Organic and All Natural,
    *Do Consumers Know the Difference*, Jeffery Anstine (2007) Vol. 26, No. 1 ...................... 3, 5, 17

**Treatises**

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d Ed. 2011) ........................................ 7, 17

**STATEMENT OF THE ISSUES TO BE DECIDED**

1.      Is there any justification for overturning the Court's Rule 23(b)(3) class certification order when Plaintiff has put forth a regression model to show damages that fully complies with the Court's order as well as *Comcast*?

2.      Under the liberal standard for the admission of expert testimony, was the Ninth Circuit correct when it held "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," rather than exclusion, is the appropriate means for Dole to counter Dr. Capps' regression models?

3.      Is there any justification for overturning the Court's Rule 23(b)(3) class certification order when Plaintiff may receive nominal damages under California law?

4.      Is there any justification for overturning the Court's Rule 23(b)(2) and 23(b)(3) classes for "ascertainability" when the smallest grossing product had "all natural fruit" excluded from the label for only the first months of the product's existence?

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2      Dole's motion to decertify the Rule 23(b)(3) damages class (the "Motion") should be denied.

3  The Court has endorsed the use of regression at class certification to show damages and Dole offers

4  no reason for the Court to double back and reject either the use of regression to measure damages or

5  the specific manner in which Plaintiff's expert, Dr. Oral Capps, performed his regressions.

6  Ultimately, Dole's *inaccurate* and hyperbolic motion is nothing but a preemptive *Daubert* attack on Dr.

7  Capps.

8      Dole's Motion mirrors the rebuttal report of its expert, Dr. Carol Scott, a marketing and

9  survey specialist with little or no experience in economics and regression models.  Dr. Scott's report

10  and Dole's Motion are compilations of misstatements of fact and distortions of Dr. Capps' model

11  and approach.  Both show a gross misunderstanding (or misstatement) of basic economic regression

12  analysis. Dr. Capps used an econometrically sound hedonic regression model commonly used by

13  courts in this type of complex litigation and gave this Court precisely what it demanded in its class

14  certification order:  a regression model that "attaches a dollar value to the consumer impact or

15  advantage," (Dkt. 142, at 26:12), and "traces damages to Dole's alleged liability by accounting for

16  several factors other than the alleged misbranding that might influence changes in price or sales." *Id.*,

17  at 30:19-21.  Dr. Capps did exactly that.  As the Court previously found, his model complies with

18  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).  Dole does not really contend otherwise.  It argues

19  only that Dr. Capps did a poor job in his work.  That is an issue for cross examination and trial.

20  Therefore, there is no reason to decertify the California damages class.

21      The Court should also deny the request to decertify the Rule 23(b)(2) class.  Dole offers no

22  new facts to justify relitigating class certification on the "ascertainability" issue.  Dole only cites this

23  Court's recent decision in *Bruton v. Gerber Prods. Co.*, 2014 U.S. Dist. LEXIS 86581 (N.D. Cal. June 23,

24  2014).  However, that case is clearly distinguishable from the facts here.

25

## BACKGROUND

26  **A.**    <u>**The Court's Class Certification Order**</u>

27      The Court held the value of restitution can be determined "by taking the difference between

28  the market price actually paid by consumers and the true market price that reflects the impact" of

Dole's "All Natural Fruit" claim. Dkt. 142, at 26:13-14. The court approved the use of regression analysis for this purpose. The Court specifically found that the regression model "sufficiently ties damages to Dole's alleged liability under *Comcast*," because it (1) "isolates the effect of the alleged misrepresentation by controlling for all other factors that may affect the price of Dole's fruit cups and the volume of Dole's sales," *id.* at 30:8-9, and (2) accounts "for several factors other than the alleged misbranding that might influence changes in price or sales." *Id.* at 30:20-21; 30:5-6.

**B.** **Dr. Capps Calculated The Impact Of Dole's Sales From Its "All Natural Fruit" Label Claim Using A Hedonic Regression Model**

Dr. Capps' regression model is consistent with the Court's order granting certification, albeit in a slightly different way than described in Dr. Capps' January 2014 report supporting class certification. Dkt. 101-9. In that report, Dr. Capps stated he would estimate "the portion of sales" as a result of the "All Natural Fruit" statement. Dkt. 101-9, ¶ 18. In so doing, he would consider differences in the before and after labeling language "All Natural Fruit." *Id.* at 20. However, the labels at issue were mislabeled throughout the entire class period. There was no "before and after." Dole would have that be the end of it. It is not. Indeed, if it were not possible to value a mislabeled product without a label change, Dole (or any other food manufacturer) would have every incentive to keep a misleading label on its products. Defense counsel would advise clients that leaving a false and misleading label on a product would potentially insulate that manufacturer from liability under California law. This is a perverse outcome that encourages violation of the law and turns the UCL on its head.

**1.** **The Methodology Is "Hedonic Regression"**

Dr. Capps calculated the portion of sales related to the label statement, but Dr. Capps employed a "hedonic" regression approach to do so. Ex. A - June 27, 2014 Capps Report ("Capps Report") ¶ 8. This was done in accordance with generally accepted economic principles. One can capture the impact on sales by focusing on units sold, price or both. This hedonic approach isolated the impact of "All Natural Fruit" label claim on the prices of the challenged products. Hedonic regression analyzes how consumers value different product characteristics. *Id.* Hedonic regression

methodology is widely accepted in economic literature – an important fact Dole does not dispute – and has even been implemented in similar cases where "all natural" labels were valued.[1]

Hedonic regression analysis is based on the principle that food products are composed of various attributes valued by consumers. *Id.* ¶ 8. The bundle of attributes defines the unit price, which implies that product prices can be decomposed into implicit prices for individual attributes. These implicit prices are called hedonic prices. Hedonic regression assesses the impact on price associated with various product attributes including product labels. The value of various product attributes are identified by assessing the product prices as a function of these attributes while controlling for other factors that may also influence product price such as seasonality, inflation and the business cycle. *Id.*

Dr. Capps statistically analyzed whether the labeling statement "All Natural Fruit" had any impact on the relevant product prices. Importantly, Dr. Capps then took the respective percentage changes in prices attributed to the statement "All Natural Fruit" gleaned from this hedonic regression analysis and multiplied by the total retail dollar sales in California associated with the relevant Dole products. *Id.* ¶¶ 8, 18. It was a two part procedure that provided the precise answer the Court demanded in its class certification order.

### 2.    The Mechanics of Dr. Capps' Analysis

To apply the hedonic approach, Dr. Capps collected data from Information Resources, Inc. ("IRI"), a widely accepted vendor used by major food and beverage manufacturers, including Dole. IRI records actual retail level sales data. *Id.* ¶ 16. Weekly information by Universal Product Code ("UPC") and by brand was obtained for January 2009 to the middle of May 2014. *Id.* ¶ 15.[2] Dr.

---

[1] Capps Report ¶ 9 fn. 1 (citing Organic and All Natural, *Do Consumers Know the Difference*, Jeffery Anstine (2007) Vol. 26, No. 1 (hereafter "*Anstine*") (finding a premium of 34 cents per ounce for "All Natural" claim on yogurt)). Even Dr. Scott cited this article in her report. Ex. B - Scott Depo., at 82:17-19. *See also*, Capps Report ¶ 9 (citing four peer reviewed articles on hedonic regressions –
   (1) Agricultural and Resource Economics Review, *Documenting Food Safety Claims and Their Influence on Product Prices*, Ji Li and Neal H. Hooker 38/3 (December 2009);
   (2) Journal of Food Products Marketing, *The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals*, Muth, M. K., C. Zhen, J. Taylor, S. Cates, K. Kosa, D. Zorn, and C. Choiniere 19:279-298 (2013);
   (3) Department of Agricultural Economics, McGill University, Montreal, *A Hedonic Analysis of Retail Milk and Oatmeal Attributes in Quebec*, Xiao, J. (2012); and
   (4) International Food and Agribusiness Management Review, *Hedonic Analysis of Sustainable Food Products*, Thasanee Satimanon and Dave D. Weatherspoon, Volume 13, Issue 4 (2010)).
[2] Dole has a subscription to IRI and repeatedly told Plaintiff in discovery that IRI only had data

Capps obtained dollar sales, unit sales, and volume sales related to retail sales from multi-outlets in California for 280 weeks. *Id.* ¶¶ 15, 16. Importantly, this data is representative of actual transactions that took place over the class period. *Id.* ¶ 15. This methodology is a "revealed preference approach" where actual prices were used in the analysis as opposed to data based on consumer's willingness-to-pay that would be elicited from surveys or experiments of hypothetical purchase decisions. *Id.* ¶ 19. Therefore, the results of such a methodology will be more accurate.

Using the IRI data, the following variables corresponding to individual UPCs were used for the hedonic regression analysis: (1) price, the "dependent variable;" and (2) a set of "explanatory variables," namely package size, seasonality, year-to-year effects, brand, the presence/absence of the labeling claim, and inflation. *Id.* ¶¶ 20, 21. The dependent variable consisted of the prices of the Dole's challenged products as well as the prices of comparator products.[3] The comparator products selected were those directly identified by the Defendant (largely comparable Del Monte products), those based on relative similarity of the products consistent with statements provided by David Spare, the Vice President of Dole Packaged Foods, LLC, and a matching of product descriptions from the IRI data. *Id.* ¶¶ 11, 22. The prices of these comparable products were representative of the market for Dole's challenged fruit products.

The dependent variable then consisted of a stacking of prices of Defendant's products and comparable products. To maintain representativeness of the market of canned fruits and to insure that the key products in the market of canned fruits were included in the analysis, Dr. Capps, when possible, selected products that were available to consumers over the same time period as Defendant's products. This selection conforms to the statistical notion of a "balanced design", that is, the same number of weeks (time periods) for each of the respective UPCs (cross sections).

---

beginning January 2010 and had no data for California only. Both assertions were wrong. The IRI data procured by Dr. Capps began January 1, 2009 and data for California only was certainly available. Consequently, Dr. Capps' damage figures are conservative, as the class period starts April 11, 2008.

[3] Due to the statistical properties inherent in pricing data, Dr. Capps performed a logarithm transformation on the dependent variable (price per ounce), which is commonly done in hedonic regression models. Thus, the coefficients on the independent variables can be interpreted as the percentage of the price that is attributable to the different product attributes and control variables that are included as independent variables in the regression equation.

Dr. Capps presented three scenarios for damages.  Dr. Capps performed eight hedonic regressions for the following: (1) pineapples; (2) apples; (3) pears; (4) peaches; (5) mixed fruit; (6) tropical salad; (7) tropical fruit; and (8) citrus fruit/mandarin oranges.  The sample sizes associated with these regressions were sufficiently large to meet statistical requirements. *Id.* ¶ 22.  Dr. Capps did not perform a regression on grapefruit because the available IRI data was insufficient to assess that product.  *Id.*[4]  For each of these hedonic regressions, two scenarios were conducted.  In Scenario 1, "all-natural" labeling claims were assumed to be made by both Dole and Del Monte.  In Scenario 2, "all-natural" labeling claims were restricted to those made by only Dole.  Finally, Dr. Capps then applied the percentage of the price associated with the labeling claim for each product to the total sales of that product over the period for which IRI data was available to derive the impact on Dole sales associated with each product that is falsely labeled as "All Natural Fruit."

In Scenario 3, Dr. Capps directly applied the *Anstine* all-natural hedonic regression coefficients to derive the impact on Dole sales associated with each product that is falsely labeled as "All Natural Fruit."

## C.    What Dole Seeks In Its Motion

Dole asks this Court to: (1) decertify the 23(b)(3) damages class based on Dr. Capps' report or conduct a *Daubert* review, (2) decertify the 23(b)(3) damages class based on ascertainability, and (3) decertify the 23(b)(2) nationwide injunction class based on ascertainability.

# LEGAL STANDARDS FOR DECERTIFICATION, *DAUBERT* AND DAMAGES

In a motion to decertify, where a plaintiff has shown that damages stem from defendant's actions, it is the defendant's burden to demonstrate that decertification is proper. *Rosales v. El Rancho Farms*, 2014 U.S. Dist. LEXIS 11134, 20 (E.D. Cal. Jan. 28, 2014).

Courts should apply a "liberal standard" for the admission of expert testimony.  *In re High-Tech Emple. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 47181, 10 (N.D. Cal. April 4, 2014) (LHK). Because of this liberal standard, courts rarely exclude expert testimony. *See* Adv. Cmt. Notes to 2000 Am. to Fed. R. Evid. 702.  Indeed, in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) the Supreme Court recognized that the purpose of Rule 702 was to *reduce* barriers to the admission of

---

[4] Discovery revealed that this product only came to market in 2011.

scientific testimony.

> *Daubert* cautions lower courts not to confuse the role of judge and jury by forgetting that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," rather than exclusion, "are the traditional and appropriate means of attacking shaky but admissible evidence."

*United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir. 1994) (quoting *Daubert*). "When an expert meets the level established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *In re High-Tech Emple. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 47181, 11.

In *Bazemore v. Friday*, 478 U.S. 385 (1986) (per curiam), the Supreme Court set out the standards for evaluating regression analysis. Justice Brennan, in a concurrence joined by every member of the Court, stated that as long as a regression includes variables accounting for the "major factors" bearing on it, lesser quarrels will go to "the analysis' probativeness, not its admissibility." *Id.* at 400.

Regression is a "mainstream tool in economic study." *In re High-Tech Emple. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 47181, 58. Courts in the Ninth Circuit have allowed experts to use hedonic regression models to show damages. *See In re Cathode Ray Tube Antitrust Litig.*, 2013 U.S. Dist. LEXIS 137944, 88-89 (N.D. Cal. June 20, 2013); *In re Toyota Motor Corp. Hybrid Brake Mktg.*, 2012 U.S. Dist. LEXIS 151559, 18-19 (C.D. Cal. Sept. 20, 2012).

Under California law, a class action plaintiff is only required provide a reasonable estimate of their damages. *Vaccarino v. Midland Nat'l Life Ins. Co.*, 2014 U.S. Dist. LEXIS 18601, 35-36 (C.D. Cal. Feb. 3, 2014) ("*Comcast* did not authorize federal courts to rewrite state substantive laws of damages. Here, California "law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.").

## ARGUMENT

### A.    Dr. Scott Is Not Qualified To Offer Her Opinions

Dole's motion is a regurgitation of Dr. Scott's rebuttal report in which Dole tried to pass off its consumer survey expert as an economist. Dr. Scott, however, is simply not qualified to analyze Dr. Capps' work. The treatise on which Dole and Dr. Scott rely so heavily, REFERENCE MANUAL ON

1    SCIENTIFIC EVIDENCE (3d Ed. 2011) ("The Reference Manual"), explains that while regression is

2    taught to students in diverse fields, that because the methodology is "difficult to master" the qualified

3    expert must have a combination of technical skills and experience. *Id.* at 328.  The Reference Manual

4    provides that "[a] doctoral degree in a discipline that teaches theoretical or applied statistics." *Id.*

5        Dr. Scott holds a doctoral degree in marketing, *not* economics.  Dr. Scott teaches marketing,

6    not economics. She has had no training in agricultural economics and does not teach agribusiness.

7    Dr. Scott admits "my field is not economics." Scott Depo., at 26:8-10.

8        Dr. Scott freely admitted she does "not consider [herself] a specialist in regression." *Id.* at

9    32:25-33:4. Dr. Scott has never taught any class on regression.  *Id.* at 33:16-23.  In her work as a

10   testifying expert she had never been asked to analyze someone else's regression. She has used

11   regression on one occasion, in litigation.  In her published works and peer reviewed and non-peer

12   reviewed research, Dr. Scott has never performed a regression analysis.  *Id.* at 23:1-7; 25:20-22.

13   Importantly, she freely admits that she has *no experience whatsoever* with hedonic regression.  *Id.* at

14   101:16-19.

15       Her lack of qualifications is telling.  As described below, Dr. Scott misunderstands even the

16   most basic regression concepts and relies on misrepresentations regarding Dr. Capps' report to

17   support her conclusions.  The six "flaws" she finds simply have no merit.

**B.    Dr. Scott's Six "Flaws" Have No Merit**

**1.    There Is No Flaw #1: Dr. Capps' Regression Model Showed The Impact On Dole Sales**

As described above, Dr. Capps used a hedonic regression model to measure the impact of

Dole's sales. Dole says the Court forbade this, but then conveniently ignores the Court's language

pertaining to an analysis of *prices*.

Dole does not seem to understand, or acknowledge, basic economics that sales = prices x

units sold.  Therefore, the impact on total sales can be ascertained by focusing on (1) price, (2) units

sold or (3) both combined.

Instead, Dr. Scott mischaracterizes Dr. Capps' approach as *only* focusing on price, but that is

misleading.  There was a two-step procedure.  First, Dr. Capps uses a hedonic regression analysis to

1    derive the impact on Dole sales that can be attributed to the mislabeled products.  Dr. Capps used

2    the hedonic regression approach – widely recognized by economists and the courts (albeit unfamiliar

3    to Dr. Scott) – in order to isolate the impact of price associated with the "All Natural" claim,

4    controlling for other factors that might influence price other than the mislabeling claim.[5]  Second, Dr.

5    Capps then applied his calculation of the percentage of a mislabeled Dole product's value associated

6    with mislabeling to data on Dole's total sales.  In this fashion, Dr. Capps computed the total impact

7    on Dole's sales associated with the "All Natural" label.[6, 7]

8         Dole says that the real question answered by Dr. Capps is "how much more a retailer

9    charges" because of Dole's "all natural" label.  This statement is absurd.  Dr. Capps' analysis,

10   however, answers the real question: How were consumers harmed and how did Dole benefit as a

11   result of the "all natural" labeling?  The class of consumers would be harmed if a part of what they

12   are valuing and paying for is something they did not actually get, *i.e.,* an "all natural" product.  As

13   shown in many academic studies cited in Dr. Capps' report, a food company such as Dole would

14   benefit through increased sales associated with labeling a product as all-natural.  Dr. Capps uses

15   scientific methods to show the proportion of Dole's sales attributable specifically to the "all natural"

16   label.  As such, Dr. Capps' approach directly focuses on the fundamental question in this case.

---

[5] With its origins in agricultural economics (when asked if she had any training in agricultural economics Dr. Scott replied, "oh, goodness, no" – Scott Depo., at 27:11) hedonic regression is traced as far back as 1928 - Journal of Farm Economics, *Quality Factors Influencing Vegetables Prices*, 10, 185-196, F.V. Waugh (1928).

[6] Dole repeatedly contends that the hedonic regression is just the "benefit of bargain" theory.  Dole has no basis to make this statement; it merely repeats it several times.  Dole's repetitions aside, this argument has no merit.  In no fashion is the use of a hedonic regression analysis tantamount to the benefit-of-the-bargain rule.

[7] Dr. Capps was deposed in this case and asked about the *Lanovaz v. Twinings* case.  Dr. Capps testified why his initial report did not include a regression model.  He said:

> Well, in the regression analysis that I was putting forth, the underlying assumption that there was a before and after. But the dependent variable there was on units sold, and we were trying to – with that methodology, trying to get at incremental differences in units sold before and after the label, and I was under the assumption -- because we didn't have any evidence to the contrary -- not only in the Dole case, but in the Del Monte case -- about when the labels were on or not on. So in that particular case, with that particular regression analysis approach, it wasn't possible to do a before and an after. But with the hedonic pricing analysis, still focusing on the regression approach, but now focusing on prices, one can do it.

Ex. C – Deposition of Dr. Capps., at 42:1-17.  On September 3, 2014, the plaintiff in *Lanovaz* filed a Motion for Reconsideration of Denial of Class Certification Pursuant to Fed. R. Civ. P. 23(b)(3). *Twinings*, 5:12-cv-02646, Dkt. 155.

Similarly, Dole's Ford Motor Company example mischaracterizes Dr. Capps' model inputs, but is a good example to show that Dr. Capps' hedonic approach could be used to answer Dole's hypothetical question: "How much could it boost sales if it could improve a model's fuel efficiency by say 5 mpg?" According to Dole, the only way to answer this question would be if Ford had already developed the new car and was able to estimate the impact on sales after this car was on the market for a few years in a "before and after" analysis. In other words, according to Dr. Scott, a survey expert, Ford can never know the answer to this question unless they actually make the change and see what happens. Obviously, that is not correct. Actually, Dr. Capps' approach would be the method that Ford would use to answer the question. This is why Ford would hire Dr. Capps, not Dr. Scott. Dr. Capps could provide the answers before Ford makes any investment as follows:

1. Find similar models to Ford's model including the model Ford is considering if it already exists – not two very dissimilar models like Mercedes Benz or Hyundai as Dole contends is part of Dr. Capps' approach;[8]

2. Identify prices of these models and various characteristics that would impact price such as brand name, seasonality, year, and miles per gallon;

3. Use the logarithm of price as the dependent variable and include miles per gallon along with other factors that could influence price just as the explanatory variables in the hedonic regression;

4. The coefficient on mpg in that hedonic regression would allow Ford to see what the percentage price impact is of mpg and they could convert that into the price and sales impact of a 5 mpg improvement, exactly as Dr. Capps does in his two-step approach to determining damages against Dole.

After its Ford example, Dole stated that "price tells us nothing about whether consumers will *agree* to pay that price or *how many* consumers will do so." Def. Br. at 7. If Dr. Scott were more familiar with hedonic models, she would know that hedonic regression is a "revealed preference approach" in that *actual prices* are used in the analysis rather than stated willingness-to-pay measures elicited from surveys or experiments from hypothetical purchase decisions.[9] The IRI data used here show actual, real world sales in dollars. These are not imaginary purchases. Thus, Dr. Capps used

---

[8] Dr. Scott's drive-by approach to criticizing Dr. Capps' work leads her to contradictions such as implying that his sample of comparable products is both too broad *and* too narrow.

[9] Revealed preference theory, pioneered by Nobel prize winning economist Paul Samuelson, is a method of analyzing choices made by individuals, mostly used for comparing the influence of policies or company marketing or labeling strategy on consumer behavior – Economica, *Consumption Theory in Terms of Revealed Preference*, Paul A. Samuelson: 243-253 (1948).

1    actual purchases to gauge what consumers were willing to pay for certain attributes.  Economists, as

2    opposed to marketers, believe the best way to analyze how people behave is to observe what they

3    actually do, and have already done.[10]

4            **2.        There Is No Flaw #2: "Brand" And "Label" Are Not Confounded.**

5            Dole states that Dr. Capps "ignores all differences between brands and products."  Def. Br.

6    at 9.  This assertion is not true.  Dr. Capps controlled for "brand."  This entire argument plainly

7    shows both Dole and Dr. Scott either do not understand, or are disregarding: (1) how the dependent

8    variable was used here and (2) the use of "dummy" variables generally in a regression analysis.

9            Dr. Scott admitted she did not understand what the dependent variable is in Dr. Capps'

10   model.  She thought it was the price of each individual product.  Scott Depo., at 124:11-17.  That is

11   wrong and, consequently, her related conclusions are all fundamentally flawed and should be

12   disregarded.  Dr. Scott's assertions on the prices of other brands through her substitutions – in what

13   she thinks is Dr. Capps' model – are all erroneous and contrary to what Dr. Capps actually did.  Dr.

14   Capps isolates the percentage price impact associated with the "all natural fruit" label on Dole's

15   challenged products.  In dealing with brand, the bundling of the other products into a single category

16   (all other brands but Dole), is a scientifically accepted method to control for brand. The estimated

17   coefficient in this instance represents, on a percentage basis, how much higher the price of the Dole

18   brand is relative to all other brands.

19           Dole and Dr. Scott assert the following:

20   For Scenario 1, his 'Brand' coding is binary: (i) Dole or (ii) Not Dole. Dole is given a
     value of '1' and everything else is thrown into the 'Not-Dole' bucket and assigned a

21   value of '0.' But what does that mean? In Dr. Capps' world, 'Del Monte' and 'Private
     Label' are the same 'Brand,' i.e., they have the exact same value.  That expedient may

22   have solved the problem of perfect collinearity, but it was intellectually dishonest.
     Def. Br. at 10.

23           If Dr. Scott had the needed knowledge or experience with hedonic regression she would have

24   recognized that due to the statistical assumptions associated these types of models, the dependent

25

26

27   _____

[10] In hedonic regression analysis, no "fictional comparables" are used. Again, based on revealed
preferences, Dr. Capps' model employed purchasing data from real consumers.  IRI does not track
28   "fictional" purchases.  Dole's  reference to "Rube Goldberg" is not only fictitious and inappropriate,
but frankly, sophomoric and unprofessional.

1   variable is converted to the logarithm of price which is what Dr. Capps used.[11]  Thus, the coefficients

2   in Dr. Capps' model (like the *Anstine* model) represent the percentage of the price that is attributable

3   to a given characteristic.

4          Thus, Dr. Scott's conclusion that Dole and Del Monte and are the same brand and have the

5   same exact value is based on her erroneous interpretation of Dr. Capps dependent variable as being

6   the price per ounce instead of the natural logarithm of the price per ounce.  She therefore

7   misinterprets the coefficients on each regression equation.[12]

8          Additionally, the fact that Dr. Capps included all other brands into one group certainly does

9   not mean he is not controlling the impact of the brand name on the price of the respective fruit

10  products.  He simply considers the *impact* of the brand name into a single group (all other brands but

11  Dole) and thus controls for the brand in that manner.   Dr. Capps' objective was to control for the

12  impact on brand and to insure his mislabeling coefficient was not a result of brand name; his hedonic

13  regression did just that.

14         Dr. Scott's criticism of the all-inclusive brand categorization used by Dr. Capps would only

15  make sense if Dr. Capps was trying to identify the *impact* of each brand name on price instead of

16  simply controlling for all brand names in determining the impact of Dole's all-natural claim.[13]

17         This issue is straightforward if Defendant's expert understood the use of dummy variables in

18  regression analysis. The base or reference category all other brand but Dole is perfectly acceptable as

19  a way to control for brand and does not confound the impact of brand on the labeling claim.

20         What was being measured was the impact of the Dole brand on price versus the impact of

21  other brands on price. That is, the concern was on the differences in price of the Dole brand vis-à-vis

22

23  [11] London School of Economics, *Form Linear Regression Models with Logarithmic Transformations*, Kenneth
    Benoit, March 17, 2011  - http://www.kenbenoit.net/courses/ME104/logmodels2.pdf

24      "Logarithmically transforming variables in a regression model is a very common way to
        handle situations where a non-linear relationship exists between the independent and
        dependent variables. Using the logarithm of one or more variables instead of the un-logged

25      form makes the effective relationship non-linear, while still preserving the linear model."

26  [12] Scott Depo., at 124:11-17 ("Q.  Are you, is it your understanding that the dependent variable used
    is the price of each product?  A. Well, each observation is the price of a product, yes.")

27  [13] Dr. Capps welcomes the opportunity to show or to have Dr. Scott show that his regression results
    would not have resulted in a lower economical or statistical measure of damages had he included

28  dummy variables for each of the other brands separately.  Dr. Scott did not – nor did she possess the
    necessary expertise to – perform these calculations herself.

other brands. In no way does this comparison imply that Dr. Capps' model assumed that the "not Dole" brands have the same value, and if that were true, all of those brands should have the same impact on price. In eliciting the impact of labeling claims on price, it is necessary to control for the impacts of price associated with brand. The way to control for the impact of brand is to use dummy variables, precisely what Dr. Capps did.[14]

Dole's attempt to discredit Dr. Capps work absent credible evidence is most apparent when Dole argues Dr. Capps mysteriously included a variable to control for size in some regressions and not others. Dole and Dr. Scott are wrong. The truth is in the instances where you had the same products with different sizes Dr. Capps included the "size" variable in his regression. Counter to Dole's assertions, the same adjustment for size was present in Dr. Capps' Scenario 2 as it was in Scenario 1. Importantly, whenever there was no difference is size across the products Dr. Capps did not, and could not, include a control for size.

### 3.    There Is No Flaw #3: Benefits To Dole Can Be Measured Using Retail Level Data

Dole's argument makes no practical sense and is not supported by academic literature.

First, Plaintiff is using the retail sales price to the class of consumers because those are the people who relied on the labels and, hence, the price to them can be used to measure the injury. Moreover, Dole cannot credibly tell this Court that it receives no benefit from the sales of its products. Since retailers mark-up the product price based on the wholesale price they pay Dole, any price impact of labeling or other product characteristics passes through to Dole – the company that made the decision as to what attributes the product would have and how that would be communicated to consumers. Dr. Scott's assumption that only retailers could benefit from consumers' valuations of different product attributes defies the fact that it is the manufacturers, not retailers that determine what these attributes are and how they are displayed on the label.

Showing her lack of understanding in economics and business concepts in general, Dr. Scott concludes that Dr. Capps should have examined wholesale prices when calculating how much *consumers* (as opposed to wholesalers) value different product attributes, such as all-natural. Because

---

[14] *See* Footnote 2, supra (citing several peer reviewed academic studies have used hedonic regression and dummy variables for factors such as "all natural" claims and brand names)

she does not understand hedonic regression and the well-established economic concept known as revealed preference, Dr. Scott does not understand that the way to draw out how consumers value different product attributes is through the prices they would actually pay for such attributes: retail prices. Dr. Scott seemed confused in her deposition as to who would receive the benefit from consumers' valuation of these product attributes.  In her report she claims Dole would not get any of the benefit. In her deposition she hedged her bet.[15]

Second, in the academic literature pertaining to the application of hedonic regression, attention is centered on *retail* prices, not wholesale prices.  Under the hedonic model, products can have similar prices and even with the use of line pricing, the value of these attributes such as an "all natural" label can be identified as long as prices of similar products without these attributes are identified and included in the analysis.[16]

Dole's citations to *Weiner v. Snapple Bev. Corp.*, 2010 U.S. Dist. LEXIS 79647, 2010 WL 3119452 (S.D.N.Y. Aug. 3, 2010) and *Red v. Kraft Foods, Inc.*, 2012 U.S. Dist. LEXIS 186948 (C.D. Cal. Apr. 12, 2012) do not help.  Neither involved a hedonic regression.  In *Weiner,* the excluded expert failed to even describe the methodology he would use to value the "all natural" label.  That is not the case here.  In *Red*, the case had nothing to do with line pricing.

### 4.    There Is No Flaw #4: Dr. Capps Controls For All Variables

Dole claims Dr. Capps did not control for (1) advertising, (2) prices of competing and complementary products, (3) the disposable income of consumers and (4) population.  Def. Br. at 12-13.  Yes he did.  Again, Dole's arguments show neither it nor Dr. Scott understand hedonic regression and, in this particular example, the roles of dummy variables.

First, Dr. Capps did not explicitly address the impact of each of the controlled variables on product price, as Dr. Scott declares he should.  There was no reason to.  Dr. Capps only had to make

---

[15] Scott Depo., at 129:24 ("All right. And if there is any price premium at retail, then at some point that premium may or may not get shared between the manufacturer and the retailer. You know, there will be some negotiation as to, what you know, who shares in the bounty of what consumers are paying for the product.")

[16] For example, hedonic regression is often used to identify the value of different attributes in the housing market.  If several homes have similar prices, but different attributes such as yard size and proximity to the city, hedonic regression will capture the value of these attributes, even though the aggregate home prices are similar.

1  sure these variables were included in the regression so that their impact on price would not be

2  erroneously captured in the labeling coefficient.  To discuss the impacts of these explanatory

3  variables would not have offered any useful information to the Court directly related to damages.

4          Second, Dr. Capps controlled for the aforementioned variables. He controlled for advertising

5  via his quarterly and year dummy variables.  If advertising expenditures or media spend varied in a

6  given year or in a given quarter,  such that it would have had an influence on the retail price of fruit

7  products, that advertising impact would be captured in the quarterly and annual dummy variables and

8  thus controlled for in his regression.  Typically, advertising expenditures or media spend have a

9  seasonal pattern (holidays, for example), and  this pattern would be controlled for in Dr. Capps'

10  quarterly dummy variables. As well, advertising expenditures or media spend may vary year to year.

11  This impact would be captured by the year dummy variables.

12          He controlled for disposable income and population in his "year" dummy variable.  *Id.* at

13  58:19-24.  Dole complains that population is not explicitly in his model and that he never explains

14  why income and population would vary across "*brands*."  However, Dole (again) misses the basic

15  point.  The impacts of disposable income or population are on *price* not brands.  Dole's contention is

16  a red-herring.

17          He also controlled for prices of competing and complementary products.  Dole's assertion

18  otherwise is just wrong.  Fundamentally, the dependent variable in the hedonic regressions consisted

19  of a stacking of prices of not only the relevant Dole products, but also comparable products.  These

20  products are clearly identified and part of his analysis.  Dr. Scott should understand this, but she

21  clearly does not.

22          Dole then disingenuously references the "odd disappearance of 'size' in some regressions."

23  Def. Br. at 13.  Dole certainly has no basis to suggest this is "odd," it just does, and suggests that

24  "size" in some regressions and not others appears to be strange.  Dole says "size and packaging

25  matters" and that "packaging is irrelevant" to Dr. Capps.  This is another testament to Dole's

26  inability to understand regression, but great ability to attempt to distort what Dr. Capps did.

27          Of course size and packaging matter.  Plaintiff agrees.  That is why, here, there was *always* a

28  control variable for size in any regression where there are products of different sizes.  In the cases

where there was no variation in package size no such variable is needed.  This is basic regression.  In Dr. Capps' Report, he clearly indicated why package size is indeed part of the hedonic regression models.  He stated that size "represents price discounts associated with large packages and has been shown by some of the researchers discussed to impact price."  Capps Report ¶ 21.

Dr. Scott had access to the data and should have easily understood why this variable was excluded in some regressions. All Dr. Scott would have to do is place this variable in the hedonic regressions in which there was no size variable. She would have easily seen that there was no variation in package size because an error message would have been given by the software program. Stated even more simply, all Dr. Scott had to do was to examine the data.  She did not take the time, did not understand what she was reviewing, or intentionally misstated what Dr. Capps did.[17]

### 5.     There Is No Flaw #5: The Only Embarrassment Is Dole's Misleading Statements

This is where Dole gets reckless.  It contends Dr. Capps made a series of data "errors" that make his opinions unreliable.  He did not, and Dole knows it.

First, Plaintiff agrees that Dr. Capps did not perform a regression on the grapefruit.  There is a simple reason:  there was insufficient IRI data to do so.  Dr. Capps' analysis required a large amount of data, 280 weeks of data at a minimum, so he did not attempt to perform a regression with less.  There is no "error" as Dole claims.[18]

Second, Dr. Scott and Dole submit a series of pictures from various private label products that have the word "natural."  Def. Br. at 14; Scott Report, Ex. 5.  They contentiously argue that this proves Dr. Capps' assumption that private labels do not have the same "all natural fruit" label is wrong.  Dole has one problem, it left off the word "all."  Not a single one of Dr. Scott's examples

---

[17] Dole complains Dr. Capps should not have dismissed certain variables because these factors are not directly measurable. Dole said they are.  Again, it has no support for this generic assertion.  If Dole knows that omitted factors were measurable, why didn't Dr. Scott name these factors and obtain their measures?  Moreover, why didn't Dr. Scott re-run Dr. Capps' hedonic regressions with these factors included as additional explanatory variables to ascertain their impact on price? The answer is that it is more convenient to make generic criticisms instead of proving what you say.

[18] Contrary to Dole's next assertion, this Court has not made a finding that any private label products are not comparable to Dole.  Def. Br. at 14.  In its order, the Court did reject the use of the "benefit-of-the-bargain" theory because it only compared prices and attributed all the price difference to the "all natural fruit" label claim.  In regression, that is not the case.  Again, no "error."

1  has the phrase "*all* natural." Not one, a major point that Dole glosses over.[19]  Not only has Dole not

2  offered a shred of evidence that what Dr. Capps says is indeed wrong, but their "evidence" actually

3  supports Dr. Capps in his statement that private labels used in his hedonic regressions do not have

4  Dole's "all natural" claim on the labels.[20, 21]

5        Third, Dole claims Dr. Capps "inexplicably" did not use certain private label products

6  identified in the IRI data in his regressions. Why? Dole tells the Court "he never says." Def. Br. at

7  15. Again, Dole misrepresents the facts. Dr. Capps did say exactly why in both his report and his

8  deposition. In order to address market representativeness and sufficient sample size, Dr. Capps

9  selected comparable products based on (1) the UPC description from the IRI data and (2) having a

10  proper number of time periods, at least 280 weeks.

11        Dr. Scott never considered either of these factors in her critique. She never considered the

12  relative similarity of the products and did not understand there was a minimum amount of

13  observations (i.e., weeks) that Dr. Capps wanted to use to have the amount of data consistent with

14  the class period and representative of the market. For example, in Exhibit 6H to Dr. Scott's report,

15  she complains that Dr. Capps only used one of the two listed private label products in his regression.

16  The product that Dr. Scott bellows should have been used had *four* observations of out of 280

17  concerning prices. To be clear, an average price could have been calculated from four observations,

18  but this average price would not have been representative over the time frame from January 2009 to

19  [19] This was no oversight by Dr. Scott. Defense counsel asked Dr. Capps about the "all natural" label at length.

20  [20] "Through the testimony provided the Vice President of Dole Packaged Foods LLC, we realize that comparator products to Defendant's products exist without the "All Natural Fruit" claims." Capps

21  Report ¶ 11. Also, Dr. Scott oddly continues to argue that the label claim "organic" is somehow in this litigation. Obviously it is not. Dr. Capps even stated "[o]rganic has never entered into my

22  analysis in Exhibit 1 here at all." Capps Depo., at 28:5-6.

23  [21] Dr. Capps confirmed his assumption. In his deposition, Dr. Capps testified that he confirmed his contention about private labels via the third party website www.hoovers.com. Capps Depo., at 13:24-

24  25, 30:17-21. Additionally, Dr. Capps relied "on my experiences and -- with the food industry over the past 30 years and specifically experiences with private label or store brands, typically labeling

25  claims are not associated with private label products." *Id.* at 27:11-14. Evidence by expert "was admissible as an 'assumption' because an expert's opinion may rely on disputed facts. When an

26  expert's testimony relies on one party's version of the facts, it is not the Court's role to evaluate whether those facts are correct." *Ill. Tool Works, Inc. v. MOC Prods. Co.*, 2014 U.S. Dist. LEXIS 76360,

27  13 (S.D. Cal. June 2, 2014). Moreover, "arguments that an expert relied on unfounded assumptions in forming his opinion go to the weight, not the admissibility,

28  of expert testimony." *Haiping Su v. NASA*, 2011 U.S. Dist. LEXIS 153566, 8 (N.D. Cal. Apr. 7, 2011).

mid-May 2014.

Fourth, Dr. Capps did not incorrectly code the data for "citrus fruit." Dr. Scott is wrong about that. Moreover, she provides no evidence to support her statement as to the nature of the data problems, and importantly, does nothing to "fix" these problems and re-run the hedonic regressions.[22]

### 6. There Is No Flaw #6: Use Of The *Anstine* "All Natural" Study Satisfies *Comcast*

Dole charges that Dr. Capps chose the *Anstine* yogurt study over the others because it yielded one of the highest coefficients for the effects of "all natural" labels. This is wrong. Dr. Capps used the *Anstine* study because it was the closest one in the academic literature to the facts of this case, i.e., the use of hedonic regression and to ascertain the value of "All Natural" claims in the United States. Notably, Dr. Scott never offered another study that met these characteristics. She also admitted she was unfamiliar with any of the peer reviewed studies cited by Dr. Capps dealing with hedonic regressions. Since the results of *Anstine* were based specifically on the value of an "all natural" claim for a United States food product, it would be the most appropriate study to apply to the Dole case as an alternative to Dr. Capps' detailed analysis. This approach would be applicable if consumers value "all-natural" claims the same across different food products. Dole has not provided any evidence suggesting consumers value the "all natural" claims higher for yogurt than for Dole fruit products.

While Dr. Scott compares the $R^2$ of Dr. Capps' regressions with those of *Anstine* (depicting only the highest $R^2$ values from *Anstine* and the lowest $R^2$ values from Dr. Capps' regression as comparators) she fails to mention that with Anstine's higher $R^2$ values came a *much higher* coefficient for "all natural" claims.[23] Dr. Scott's focus on $R^2$ for the *Anstine* versus Capps models further highlights her lack of knowledge in hedonic regression analysis. While the $R^2$ metric may be

---

[22] This is a constant throughout Dr. Scott's report. She never performed any regressions herself to prove anything she said was correct or what Dr. Capps did was incorrect. Even in a situation like this, where it would seemingly be very simple to correct this supposed data error, she only offers generic criticisms. It would have taken Dr. Scott less than one minute to correct this error and re-run her own regression analysis. Dr. Scott had all the information she needed to perform her own regressions to demonstrate the repercussions of her accusations. She never even tried.

[23] Additionally, "[i]t follows as a corollary that a high $R^2$ does not by itself mean that the variables included in the model are the appropriate ones. As a general rule, courts should be reluctant to rely solely on a statistic such as $R^2$ to choose one model over another." The Reference Manual, at 217.

important for a model that is meant to *predict* prices (as Dr. Scott erroneously believes Dr. Capps tried to do), Dr. Capps is trying to test whether there is an impact of an "all natural" claim on prices and hence sales. For such an analysis the important statistical metric is the p-value on the labeling coefficient which is statistically significant at very high levels in both the *Anstine* and Capps models.

**C.    The Damages Class Should Remain Certified Because Under California Law The Court Should Award Nominal Damages**

Alternatively, the (b)(3) class should remain certified and awarded nominal damages. *See* Cal. Civ. Code § 3360. Courts allow the recovery of nominal damages if real, actual injury has occurred and damages have been suffered, but the extent and amount of the injury and damages cannot be determined from the evidence presented. *ProMex, LLC v. Hernandez*, 781 F. Supp. 2d 1013, 1019 (C.D. Cal. 2011).[24] The Ninth Circuit has stated class members are entitled to nominal damages. *Cummings v. Connell*, 402 F.3d 936, 942-45, 2005 U.S. App. LEXIS 4954 (9th Cir. 2005). If Dr. Capps' model is rejected, the Court should award nominal damages at trial.

**D.    There Is No Ascertainability Problem For Either Class**

*Bruton v. Gerber Prods. Co.*, 2014 U.S. Lexis 86581 (N.D. Cal. June 23, 2014) (LHK) is readily distinguishable. In that case, there were "69 different types of Gerber baby food products, seven product sub-categories and multiple flavors within each sub-category." *Id.* at 13. Here, there are only 10 products and Dole argues that that only one – the smallest by far in terms of revenue over the class period[25] – did not say "All Natural Fruit" between a relatively short time, August 2008 to March 2009. The Court's concerns with Gerber product variation do not exist here.[26]

**CONCLUSION**

Dole's Motion should be denied.

---

[24] In addition, the award of nominal damages in lieu of actual damages will allow the Plaintiff and the Class to seek costs. *Scofield v. Critical Air Medicine, Inc.*, 45 Cal. App. 4th 990, 1009, 52 Cal. Rptr. 2d 915, 1996 Cal. App. LEXIS 474 (Cal. App. 2d Dist. 1996). This is important because a judgment awarding nominal damages would entitle the prevailing party to an award of costs, the failure to award nominal damages can constitute reversible error. *Staples v. Hoefke*, 189 Cal. App. 3d 1397, 1406, 235 Cal. Rptr. 165 (1987) (failure to award nominal damages not reversible when costs award would be discretionary under Code Civ. Proc. § 1032(d)).

[25] Ex. D - DPF00017725 (Dole sales data produced in discovery; see Excel line 42).

[26] Regardless, decertification would not be the answer. For example, the Court could amend the class definition to commence in 2009. Dr. Capps' damage models start from January 1, 2009 because that was as far back as the IRI data allowed.

Dated:  September 11, 2014.

Respectfully submitted,

    /s/ *Charles Barrett*
Charles Barrett
CHARLES BARRETT, P.C.
6518 Hwy. 100, Suite 210
Nashville, TN 37205
(615) 515-3393
charles@cfbfirm.com

Ben F. Pierce Gore
PRATT & ASSOCIATES
1871 The Alameda, Suite 425
San Jose, CA 95126
(408) 429-6506
pgore@prattattorneys.com
Brian Herrington
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square N.
Lexington, MS 39095
(662) 834-2488
bherrington@barrettlawgroup.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Charles Barrett, hereby certify that a true and complete copy of the foregoing was served to all counsel of record via the ECF filing system on September 11, 2014.

    /s/  *Charles Barrett*
Charles Barrett